2024 IL App (2d) 230505
No. 2-23-0505
Opinion filed February 14, 2024

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 23-CF-2465 |
| | ) | |
| BRYANT J. MANCILLA, | ) ) | Honorable Salvatore LoPiccolo, Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court, with opinion.
Presiding Justice McLaren and Justice Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant, Bryant J. Mancilla, appeals from the circuit court's order granting the State's verified petition to deny him pretrial release pursuant to article 110 of the Code of Criminal Procedure of 1963 (Code), as amended by Public Act 101-652 (eff. Jan. 1, 2023), commonly known as the Pretrial Fairness Act (Act).[1] See Pub. Act 102-1104, § 70 (eff. Jan. 1, 2023) (amending various provisions of the Act); *Rowe v. Raoul*, 2023 IL 129248, ¶ 52 (lifting stay and setting effective date as September 18, 2023).

_____

[1]The Act is also commonly known as the Safety, Accountability, Fairness and Equity-Today (SAFE-T) Act.

¶ 2    The Office of the State Appellate Defender declined to file a memorandum pursuant to Illinois Supreme Court Rule 604(h) (eff. Oct. 19, 2023), filing a "Notice Filed in Lieu of Rule 604(h) Memorandum" on January 10, 2024. Thus, defendant stands on the notice of appeal filed by his public defender in the circuit court, which consisted of five checked boxes on the standard form, only two of which were supported by any additional language. For the following reasons, we affirm.

¶ 3                                     I. BACKGROUND

¶ 4    On November 14, 2023, defendant was charged by complaint with 13 total counts of the following offenses: (1) armed robbery with a firearm, a Class X felony (720 ILCS 5/18-2(a)(2) (West 2022)); (2) armed violence committed with a dangerous weapon (*id*. § 33A-2(a)), in that he committed the felony of aggravated battery causing great bodily harm to a victim 60 years of age or older while using a firearm, a Class X felony (*id*. § 12-3.05(a)(4)); (3) home invasion while armed with a firearm, a Class X felony (*id*. § 19-6(a)(3)); (4) two counts of home invasion intentionally causing injury, a Class X felony (*id*. § 19-6(a)(2)); (5) being an armed habitual criminal, in that defendant knowingly possessed a firearm after having been convicted of two unlawful use of weapon offenses, a Class X felony (*id*. § 24-1.7(a)); (6) receiving, possessing, or selling a stolen motor vehicle, a Class 2 felony (625 ILCS 5/4-103(a)(1) (West 2022)); (7) aggravated battery causing great bodily harm to a person 60 years of age or older, a Class 2 felony (720 ILCS 5/12-3.05(a)(4) (West 2022)); (8) two counts of aggravated battery using a deadly weapon, a Class 3 felony (*id*. § 12-3.05(f)(1)); (9) possession of a firearm while Firearm Owners Identification (FOID) card is expired or not eligible, a Class 3 felony (430 ILCS 65/2(a)(1) (West 2022)); (10) unlawful use of a weapon by a felon, a Class 3 felony (720 ILCS 5/24-1.1(a) (West 2022)); and (11) battery causing bodily harm, a Class A misdemeanor (*id*. § 12-3(a)(1)).

¶ 5    That same day, defendant initially appeared before the circuit court and the State filed its verified petition to deny defendant's pretrial release. Along with its verified petition, the State also filed its exhibit 1, a 12-page "Police Department Synopsis," which provided as follows.

¶ 6    On November 11, 2023, at approximately 9:17 a.m., Elgin police officers were dispatched to 383 Division Street following a report of a shooting, which was later reclassified as an armed robbery. Dispatch advised that a male suspect, armed with a gun, drove away in one of the victim's vehicles. Once the police officers arrived at the scene, they found two male victims who stated that they had been physically struck with a firearm by an unknown suspect who fled the scene. The two victims were transported to the hospital by paramedics for treatment. One of the victims was bleeding from his head.

¶ 7    Police officers traced the cell phone of one of the victims, who had left the phone inside the vehicle defendant allegedly stole. The officers traced the cell phone ping to another location in Elgin but were unable to locate the vehicle and the suspect.

¶ 8    Thereafter, an Elgin police detective interviewed one of the victims, Francisco Rodriguez, at the hospital. Francisco had left his home on the morning of November 11 to pick up his brother, Julio, whose truck had broken down in another city. Francisco and Julio had stopped at 383 Division Street to pick up a trailer that was inside the garage. When Francisco drove into the driveway at that location, he noticed defendant sitting across the street. Francisco pulled into the driveway, left the vehicle while it was still running, and entered the garage. Shortly thereafter, Francisco saw defendant walking towards him and he thought defendant was going to ask for money. Defendant instead asked Francisco and Julio about their employer. Francisco told defendant that they were not working for anyone, at which point, defendant started to hit Julio's head with a gun. Francisco observed defendant hit Julio on the head twice with the gun. He told

the detective that defendant either knocked out Julio or that Julio pretended that he was knocked out after being struck. Defendant stood next to Francisco and told him that he was going to kill him. Defendant told Francisco to turn around and Francisco complied. Defendant searched Francisco's front and back pants pockets and took Francisco's wallet. Defendant then hit Francisco in the back of the head. When Francisco woke up, he told his daughter to go inside the home and call the police.

¶ 9        Francisco did not know who defendant was and stated that he did not have a problem with anyone. He described the suspect's appearance and the weapon to the detective. He also told the detective that he would be able to identify the suspect in a photo lineup.

¶ 10       Police officers also spoke with Marie Rodriguez, Francisco's wife and the owner of the vehicle defendant allegedly stole. Marie stated that she would sign complaints against the offender.

¶ 11       Next, police officers interviewed Julio Rodriguez at the hospital emergency room. After Julio and Francisco arrived at 383 Division Street, Julio saw a male subject sitting across the street and smoking a cigarette. After Julio and Francisco pulled into the driveway of the home, they exited the vehicle and entered the garage. At that point, Julio saw the man from across the street walking towards them. When the man entered the garage, he stated, "Hi how are you?" The offender then pulled out a handgun with his left hand and told them to put their money on the ground. Defendant stated that he was going to kill them. Julio agreed to give the suspect his money, at which point defendant asked them why they wanted to kill someone. Julio did not remember the name of the person defendant referenced. Julio then lay on the ground and at that point, he felt a strike to his head. Julio remained on the ground and did not stand up because he was afraid that defendant would shoot him. While he stayed on the ground, he heard defendant hit Francisco. He also heard defendant kick Francisco multiple times, followed by silence. Francisco asked Julio for

help, but Julio told Francisco not to move. After Francisco asked for help again, Julio stood up and no longer saw defendant. Julio then went to ask for help. He told police officers that he had never seen defendant before and did not recognize him.

¶ 12    Later in the afternoon of November 11, police officers canvassed the area of 383 Division Street for evidence and located a cigarette, but Marie stated that it was hers. Police then located the victims' vehicle parked in front of 425 Park Street in Elgin. The keys to the vehicle remained in the ignition. Police towed the vehicle for processing and collecting evidence. Police also recovered a video recording from 389 Division Street and uploaded the file. The video showed that at 9:07 a.m. on November 11, 2023, "the suspect" sat on a cement wall on Division Street, directly across the street from 383 Division Street. He appeared to be smoking a cigarette with his right hand. At 9:08 a.m., the victims' vehicle pulled into the driveway at 383 Division Street. At 9:11 a.m., the suspect walked toward 383 Division Street, holding a cigarette in his hand as he approached the driveway. He then reached for a firearm from his front waistband and entered the garage at 9:12 a.m. Then at 9:15 a.m., he ran out of the garage and entered the driver's seat of the victims' vehicle, reversed out of the driveway, and drove away.

¶ 13    On November 12, 2023, police officers returned to 383 Division Street and recovered another cigarette butt in the driveway, which did not match Marie's cigarettes. Police officers also recovered video from cameras mounted outside of 425 Park Street. In addition, police recovered video from a homeowner residing at 416 Park Street, which captured the suspect running away from the scene. Additional video footage from Park Street cameras showed that a male subject matching the suspect's description exited the front driver's seat of the victims' vehicle. The suspect had dropped an item, black in color, in the roadway when crossing the street. Police described the item as resembling a gun magazine. The suspect picked up the item and continued walking across

the street. The suspect then returned to the victims' vehicle, opened the front driver's door, and appeared to grab something from inside the vehicle. The suspect walked across the street once again and started running westbound on Park Street.

¶ 14 After viewing the videos, police canvassed the area of Park Street, including prior contacts and calls for service at 388 and 398 Park Street. Police officers located a recent dispatch for service at 388 Park Street involving defendant. The notes for that call stated that defendant has schizophrenia and had been refusing to take his medicine. The officers searched defendant's booking jacket and observed that he had multiple arrests and that he is associated with the "Brown Pride" gang. The officers also noted that defendant's booking photographs closely resembled the suspect seen on the video at 389 Division Street.

¶ 15 One of the officers printed a photograph from defendant's file and contacted defendant's mother, who had recently called Elgin police for assistance with defendant. Defendant's mother agreed to speak to Elgin police officers and told them he has a mental disability that requires medication. He had been diagnosed with schizophrenia, bipolar disorder, and diabetes. She also told the officers that he takes drugs, including cocaine. Further, she told police that defendant no longer resides with her; rather, he lives with his father at 388 Park Street. When the officers showed defendant's mother a still image from the video recovered from 389 Division Street, she positively identified defendant as the suspect.

¶ 16 On November 13, 2023, Detective Joniak of the Elgin police department prepared a photo lineup for Francisco. Detective Ziegler administered the photo lineup and Francisco positively identified defendant as the suspect.

¶ 17 On the same date, Elgin police officers spoke to defendant's father at his residence, 388 Park Street, who told them that defendant resides in the basement. Defendant's father stated that

defendant had not been taking his medication and that he needs help. He was aware that defendant had one firearm and did not know from where he had obtained it. Defendant's father gave the officers consent to search the basement at his residence. Later that morning, police officers arrived at 388 Park Street to locate defendant. Police arrested defendant at 388 Park Street and found a bag with a rifle inside a garbage bin at that location.

¶ 18    Police officers interviewed defendant, who waived his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). He initially told the officers that he was not involved in this incident and did not own any firearms. After showing defendant a photograph of the handgun that the officers recovered, he told the officers that he bought the firearm for protection. Defendant stated that he went to 383 Division Street to protect himself and that he "approached [two] fat guys and asked them why they wanted to kill him and his dad." Defendant stated that he got mad, raised the gun toward both of them, and began to strike both of them with the gun. Defendant stated that he grabbed a wallet from one of the victims, opened it up, and threw it on the ground. Defendant stated that he then ran away and entered a silver vehicle. Defendant told the officers that he did not know what kind of vehicle he entered and stated only that it was very dirty inside. Defendant drove the vehicle around the corner and went home afterwards.

¶ 19    Also on November 14, 2023, the circuit court heard the State's petition and denied defendant's pretrial release. The court had read the police department's synopsis, considered the history and characteristics of defendant, including his prior criminal history indicative of violent, abusive, or assaultive behavior, and found sufficient evidence to detain him. The court stated that, along with the synopsis, it considered evidence of defendant's psychological, psychiatric, or similar social history, which tended to indicate a violent, abusive, or assaultive history, and also considered the direct threat to the safety of the victims, Francisco and Julio, as well as the threat

to the community in general, considering the random selection of the victims. Based upon the State's verified petition, the proffered evidence, and testimony heard by the court, and having considered the factors in determining dangerousness, the court found that the State proved by clear and convincing evidence that the proof was evident and the presumption great that defendant committed the charged offenses. In addition, the court found that the State proved by clear and convincing evidence that defendant posed a real and present threat to the safety of the victims and the community, based upon the specific articulable facts in the record, including defendant's statement admitting to the offenses. The court stated that, "combined with the mental health history and the fact that he is not taking his medication as ordered, despite his mother's intentions, his father's intentions *** those are specific and articulable facts that I believe there is a real and present threat to the safety of [the victims] and the community in general because of the randomness of attacking people who live across the street from him." Finally, the court found that the State proved by clear and convincing evidence that there are no conditions or combination of conditions of pretrial release that can mitigate the real and present threat posed by defendant. Regarding whether to impose electronic home monitoring upon defendant, the court stated that "[t]here is nothing I can do to prevent him from crossing the street and attacking these people again." The court entered a written order the same day.

¶ 20                                              II. ANALYSIS

¶ 21    Defendant filed his notice of appeal the same day, on November 14, 2023. In his standard form notice of appeal, defendant's public defender checked five boxes, only two of which contained any elaboration identifying a basis for the checked claim of error. The first argues that the State failed to meet its burden of proving by clear and convincing evidence that the proof was evident or the presumption great that he committed the offenses charged because the circuit court

"erred in finding just a synopsis to be sufficient evidence." The second argues that the State failed to meet its burden of proving by clear and convincing evidence that he poses a real and present threat to the safety of any person or persons or the community, based on the specific, articulable facts of the case because the court erred in finding defendant's "mental health condition as indicated in People's Ex. #1 was indicative of his violence [*sic*], abusive, or assertive [*sic*] nature." The other checked boxes' preprinted claims assert generally that the State failed to meet its burden that no condition or combination of conditions of release could mitigate the threat posed by defendant; the court erred in determining that no condition or combination of conditions would reasonably ensure defendant's appearance at future hearings or prevent him from being charged with subsequent felonies or Class A misdemeanors; and defendant was denied an opportunity for a fair detention hearing. On January 10, 2024, the Office of the State Appellate Defender filed a notice indicating that it declined to file a memorandum in support of this appeal pursuant to Rule 604(h).

¶ 22    Pretrial release is governed by article 110 of the Act. 725 ILCS 5/110-1 *et seq.* (West 2022). Under the Act, a defendant's pretrial release may be denied only for certain charged offenses. *Id.* §§ 110-2(a), 110-6.1. Here, defendant was charged with qualifying offenses. See *id.* § 110-6.1(a)(6)(D), (O) (listing as qualifying offenses armed habitual criminal and the unlawful use or possession of weapons by felons).

¶ 23    To deny a defendant pretrial release, the circuit court must find that the State proved the following by clear and convincing evidence: (1) the proof was evident or the presumption great that defendant committed a detainable offense (*id.* § 110-6.1(e)(1)); (2) defendant's pretrial release posed a real and present threat to the safety of any person or persons or the community (*id.* § 110-6.1(e)(2)); and (3) no condition or combination of conditions could mitigate the real and present

threat to the safety of any person or the community or prevent the defendant's willful flight from prosecution (*id.* § 110-6.1(e)(3)). We review whether the circuit court's findings were against the manifest weight of the evidence. *People v. Trottier*, 2023 IL App (2d) 230317, ¶ 13; *People v. Vingara*, 2023 IL App (5th) 230698, ¶ 10. A finding is against the manifest weight of the evidence when it is unreasonable. *People v. Sims*, 2022 IL App (2d) 200391, ¶ 72. We review for an abuse of discretion the circuit court's ultimate decision regarding pretrial release. *Trottier*, 2023 IL App (2d) 230317, ¶ 13.

¶ 24    We reject defendant's argument that a police synopsis is *per se* insufficient to demonstrate that the proof was evident or the presumption great that defendant committed the charged offenses. At a pretrial detention hearing, the State is explicitly permitted to present evidence "by way of proffer based upon reliable information." 725 ILCS 5/110-6.1(f)(2) (West 2022); see also *id.* § 110-6.1(f)(5) (exempting detention hearings from the rules of evidence). Without explaining why this particular police synopsis was not "reliable information" under the Act, the public defender's notice of appeal simply asserts, "[t]he Court erred in finding just a synopsis to be sufficient evidence." This bare, conclusory argument has been commonly asserted in appeals involving the Act but, without more, is patently without merit. We have previously held that a police synopsis alone is sufficient to sustain the State's burden. *People v. Horne*, 2023 IL App (2d) 230382, ¶ 24 (opinion filed December 18, 2023). We note that the public defender's notice of appeal was filed prior to *Horne*, but the Appellate Defender's notice to the court was filed almost a month after this court's decision, on January 10, 2024. To argue after this point that a proffer of a police synopsis is *per se* insufficient is frivolous, as this contention flies in the face of now-established case law and clear statutory language.

¶ 25    Even if we were to consider defendant's claim of error as an argument that the proffered police synopsis did not contain sufficient evidence that he committed the charged offense, the synopsis is replete with evidence that defendant committed the nonprobationable charged offenses of armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2022)) and unlawful use or possession of a weapon by a felon (*id*. § 24-1.1(a)), in addition to armed robbery with a firearm, armed violence with a firearm, home invasion with a firearm, and aggravated battery causing bodily harm to a person 60 years of age or older, among other violent crimes. Contained within the synopsis is a seven-page narrative of events, including allegations that state defendant struck both Francisco and Julio Rodriguez with a firearm on their heads multiple times, took Francisco's wallet, and stole their vehicle. Police officers described video footage of defendant at the scene of the crime and at the location where the stolen vehicle was recovered. Defendant's mother identified him in the video footage. Francisco identified defendant as the perpetrator in a photo lineup. Defendant admitted that he committed the offenses. Police officers recovered the stolen vehicle and defendant's firearm. This evidence is clear and convincing that defendant committed detainable offenses.

¶ 26    Second, as to defendant's "dangerousness," defendant's notice of appeal argues only that one of the section 110-6.1(g) factors was considered in error, that being defendant's mental health history. 725 ILCS 5/110-6.1(g)(2)(B) (West 2022). This, of course, is only one of nine listed factors in the Act, many of which were present here as well: the offenses involved a firearm (*id*. § 110-6.1(g)(1)); defendant had a criminal history indicative of violent, abusive, or assaultive behavior (*id*. § 110-6.1(g)(2)(A)), including charges of armed habitual criminal and unlawful use of a weapon by a felon (*id*. § 110-6.1(g)(7)); and a victim in the alleged aggravated battery causing great bodily harm was 60 years of age or older (*id*. § 110-6.1(g)(6)). Given defendant's criminal

history and section 110-6.1(g)(7)'s explicit recognition of the inherent danger of firearms, the physical violence and assaultive circumstances of the offense, and the injuries to the victims, the circuit court's finding that defendant posed a real and present threat to the safety of Francisco and Julio Rodriguez, as well as to the community, was not against the manifest weight of the evidence.

¶ 27 Defendant's specific assertion, however, that "[t]he Court erred in finding the Defendant's mental health condition as indicated in [the police synopsis] was indicative of his violence [*sic*], abusive, or assertive [*sic*] nature" is also wholly without merit. The Act explicitly allows consideration of the "history and characteristics of the defendant including *** [a]ny evidence of the defendant's psychological, psychiatric or other similar social history which tends to indicate a violent, abusive, or assaultive nature, or lack of any such history." 725 ILCS 5/110-6.1(g)(2)(B) (West 2022). The evidence before the circuit court included diagnoses of schizophrenia and bipolar disorder, noncompliance with prescribed medication regimens, illicit drug use including cocaine, as well as concomitant possession of two firearms after two prior felony convictions involving firearms. The circuit court properly considered these facts, in combination with all applicable section 110-6.1(g) factors, including the facts of the case wherein defendant is accused of pistol-whipping two strangers, robbing them at gunpoint, threatening to kill one of them, and stealing their vehicle. Clearly, the court did not err in finding defendant to pose a real and present threat to the safety of the victims and the community.

¶ 28 Defendant's remaining claims of error are simply checked boxes on the standard form generally concerning a circuit court's findings that no condition or combination of conditions of pretrial release can mitigate the threat posed or ensure appearance, as well as "[d]efendant was denied an opportunity for a fair hearing prior to the entry of the order denying or revoking pretrial release." These bare assertions are devoid of arguments or facts in the notice of appeal, there is no

memorandum, nor can we characterize the arguments made before the circuit court as containing any such claims. Because defendant provides no argument in support of these contentions, he has forfeited these issues on appeal. *People v. Duckworth*, 2024 IL App (5th) 230911, ¶ 8 (finding, among other things, that "this court has nothing on which to base an analysis of the defendant's allegations on appeal, and the defendant has forfeited the issues raised on appeal," since defense counsel "declined its opportunity to provide the missing argument, citation of the record, or authority that would support any argument that could have been made for the issues raised on appeal"); see also *People v. Acosta*, 2024 IL App (2d) 230475, ¶ 16 (declining to review issues raised only in the notices of appeal but not included in defendant's memorandum); *People v. Forthenberry*, 2024 IL App (5th) 231002, ¶¶ 41-42 (finding that OSAD's memorandum controls the issues addressed on appeal); *People v. Rollins*, 2024 IL App (2d) 230372, ¶ 22 (finding defendant abandoned those Rule 604(h) claims raised in the notice of appeal but not addressed in OSAD's memorandum).

¶ 29    Nonetheless, the evidence clearly supported the circuit court's determination that no set of release conditions could mitigate the threat defendant posed to the two victims and the community. Although defendant stated in his notice of appeal that the court erred when it found his mental health condition was indicative of violent, abusive, or assertive conduct, it was his criminal history, particularly prior felonies involving firearms, that demonstrated his dangerousness and history of noncompliance and disregard for conditions or restrictions. The specific, articulable facts of this case all weigh heavily in favor of the circuit court's determination that no condition or combination of conditions could mitigate the real and present threat defendant posed. Moreover, the fact that defendant resides in close proximity to the victims further bolsters this conclusion. Accordingly,

the court quite reasonably concluded that less restrictive conditions could not mitigate the real and present threat to the safety of the two victims and the community.

¶ 30    As for the remaining claims in the notice of appeal, there are no arguments presented and we can discern no arguable basis from the record for any of them. "[I]t is neither the function nor the obligation of this court to act as an advocate or search the record for error [citation]." *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993). " 'A reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository in which the appealing party may dump the burden of argument and research.' " *In re Marriage of Baumgartner*, 237 Ill. 2d 468, 474-75, (2010) (quoting *Pecora v. Szabo*, 109 Ill. App. 3d 824, 825-26 (1982)). Therefore, these claims are forfeited.

¶ 31    Having spent more time and effort exploring defendant's claims and potential claims than defendant's attorneys have, we now address the ethical duties of defense counsel in appeals made under the Act. We begin by noting that every attorney in every case must comply with Rule 3.1 of the Rules of Professional Conduct, which states:

> "A lawyer shall not bring or defend a proceeding, or assert or controvert an
> issue therein, unless there is a basis in law and fact for doing so that is not frivolous,
> which includes a good-faith argument for an extension, modification or reversal of
> existing law. A lawyer for the defendant in a criminal proceeding, or the respondent
> in a proceeding that could result in incarceration, may nevertheless so defend the
> proceeding as to require that every element of the case be established." Ill. R. Prof'l
> Conduct (2010) R. 3.1 (eff. Jan. 1, 2010).

Since appeals under the Act are criminal in nature, we cannot consider whether frivolousness or sanctions apply under Illinois Supreme Court Rule 375 (eff. Feb. 1, 1994), a rule applicable in

civil appeals. However, as part of defense counsel's ethical obligations under Rule 3.1, it is incumbent upon counsel to inform this court as to whether the defendant's claims are meritorious and, if not, to withdraw any frivolous claims or even the entire appeal under the Act. See Ill. R. Prof'l Conduct (2010) R. 3.1 (eff. Jan. 1, 2010).

¶ 32    We are mindful that both trial and appellate counsel are representing defendant in a criminal proceeding that could result in incarceration and that counsel have a duty to zealously defend clients in any proceeding under the Act, which includes the duty to defend against any and all assertions listed in the State's petition to detain, not only in the detention hearing but thereafter on appeal. To be sure, a defendant is "entitled to appeal any order entered under [the Act] denying his or her pretrial release." 725 ILCS 5/110-6.1(j) (West 2022). It does not follow, however, that such an appeal is mandatory or that an attorney can overlook their duties to the reviewing court. The Act has streamlined certain procedures, but it has not obviated the professional responsibility of a defendant's trial and appellate counsel to present only meritorious claims and contentions with "a basis in law and fact." Ill. R. Prof'l Conduct (2010) R. 3.1 (eff. Jan. 1, 2010). We are sympathetic that the Act has significantly increased the workload of Illinois' public and appellate defenders. We are also mindful that the Act is relatively new and its case law evolving rapidly. However, presenting baseless appeals only further burdens the justice system unnecessarily, delaying review of other cases with claims based in law and fact.

¶ 33    Here, as in many cases before this court since the Act became effective on September 18, 2023, a public defender (or sometimes a *pro se* defendant) has checked boxes on the standard notice of appeal form, without adding, elaborating or specifying any grounds to support one or more checked claims, and appellate counsel for the defense has chosen to simply stand on the notice of appeal without filing a brief or memorandum in support of it, thus continuing pursuit of

the appeal without offering any support thereof. While this practice is allowable under Rule 604(h), it is now prevalent, often leaving reviewing courts with little or no input from any of the attorneys representing the appellant. In many cases, as here, one or more of the claims checked on the form notice of appeal are frivolous.

¶ 34    We hold that in appeals of detention orders under the Act, appellate attorneys appointed to represent the defendant under the Act are required to determine whether a defendant's claims have arguable merit and, if, in their opinion, they do not, counsel cannot in good faith file or continue to pursue such a frivolous appeal or claim within an appeal. Ill. R. Prof'l Conduct (2010) R. 3.1 (eff. Jan. 1, 2010); *cf. Anders v. California*, 386 U.S. 738, 744 (1967) (holding that "if counsel finds his case to be wholly frivolous, after a conscientious examination of it, he should advise the court and request permission to withdraw").

¶ 35    We are not requiring that the procedure utilized in *Anders* cases be followed in Rule 604(h) cases. A defendant at this pretrial phase of criminal litigation is protected by the presumption of innocence. Nevertheless, attorneys' ethical duties include pursuing only meritorious claims, candor to the court, and, when appropriate, to withdraw claims that are without merit. This may be accomplished by filing an amended notice of appeal or simply by including within a memorandum on appeal pursuant to Rule 604(h) (or within a notice filed in lieu of such a memorandum) a concise statement indicating that counsel is withdrawing one or more of the claims identified in the notice of appeal that was filed in the circuit court.

¶ 36    For the foregoing reasons, the circuit court did not err in denying defendant's pretrial release, and we affirm the judgment of the circuit court of Kane County.

¶ 37    Affirmed.