2024 IL App (2d) 240017-U
No. 2-24-0017
Order filed April 4, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 24-CF-10 |
| PATRICIO J. SALAS-PINEDA, | ) ) ) | Honorable Salvatore LoPiccolo Jr., |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Presiding Justice McLaren and Justice Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in denying defendant pretrial release.  Affirmed.

¶ 2    In this interlocutory appeal, defendant, Patricio J. Salas-Pineda, appeals from the trial court's order granting the State's petition to deny him pretrial release under article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art. 110 (West 2022)), as amended by Public Act 101-652 (eff. Jan. 1, 2023), commonly known as the Pretrial Fairness Act (Act).[1]  See Pub.

---

[1]The Act is also commonly known as the Safety, Accountability, Fairness and Equity-

Act 102-1104, § 70 (eff. Jan. 1, 2023) (amending various provisions of the Act); *Rowe v. Raoul*, 2023 IL 129248, ¶ 52 (lifting stay and setting effective date as September 18, 2023). For the following reasons, we affirm.

¶ 3                                          I. BACKGROUND

¶ 4      On January 2, 2024, defendant was charged with: aggravated criminal sexual assault - armed with a dangerous weapon other than firearm (720 ILCS 5/11-1.30(a)(1) (West 2022)), a Class X felony; aggravated criminal sexual assault - acts in a manner that threatens the life of the victim (720 ILCS 5/11-1.30(a)(3) (West 2022)), a Class X felony; two counts of aggravated domestic battery - strangle (720 ILCS 5/12-3.3(a-5) (West 2022)), a Class 2 felony; aggravated unlawful restraint (720 ILCS 5/10-3.1(a) (West 2022)), a Class 3 felony; unlawful restraint (720 ILCS 5/10-3 (West 2022)), a Class 4 felony; domestic battery - bodily harm (720 ILCS 5/12-3.2(a)(1) (West 2022)), a Class A misdemeanor; domestic battery - physical contact (720 ILCS 5/12-3.2(a)(2) (West 2022)), a Class A misdemeanor; and interfering with the reporting of domestic violence (720 ILCS 5/12-3.5(a) (West 2022)), a Class A misdemeanor.

¶ 5                                      A. State's Petition

¶ 6      On the same day, the State petitioned to detain defendant. 725 ILCS 5/110-6.1 (West 2022). It alleged that defendant was charged with aggravated criminal sexual assault, aggravated domestic battery, aggravated unlawful restraint, and domestic battery, all of which the court could use to find probable cause to detain defendant. The State also alleged that defendant should be denied pretrial release on the bases that he posed a real and present threat to the safety of any

_____

Today (SAFE-T) Act. Neither name is official, as neither appears in the Illinois Compiled Statutes or public acts.

person or the community and that he had a high likelihood of willful flight to avoid prosecution. *Id.* § 110-6.1(a)(1.5), (4), (5), (6), (8). Finally, as an additional ground to deny defendant release, the State alleged that defendant had a prior conviction for driving under the influence (DUI) in 2019, he entered this country illegally through Texas in 2008 from Honduras, was charged with alien inadmissibility, and was issued a warrant/notice to appear, which appeared to be outstanding.

¶ 7 At the hearing on the State's petition, the State tendered the charging document, defendant's criminal history, and an extensive police synopsis. The synopsis related as follows. On Saturday, December 30, 2023, at about 6:25 a.m., several sheriff's deputies, and, later, Algonquin police, responded to 445 Natoma Trail in Algonquin. En route, dispatch advised that the caller, Michelle Miller, had been physically assaulted, battered, held at her residence for several hours, had a knife held to her neck, was kicked in the head and face multiple times, had been choked, forced to have sex, and was told multiple times that she was going to die.

¶ 8 Defendant was identified as the offender but had left Miller's residence in his vehicle when police arrived. Ultimately, defendant's vehicle came to rest in the front yard of 1165 Manhatas Trail in Algonquin. Defendant stated that he was at Miller's residence when an unknown male arrived, kicked him in the face, and told him to leave. In the process, defendant lost a tooth. When defendant was being taken into custody, he resisted arrest.

¶ 9 Miller was in her residence and had visible signs of injury, including to her face/head, neck, arms, back, and noticeable redness in her eyes. (Photos were taken of her injuries, but they are not contained in the record on appeal.) Miller stated that she and defendant had been in a relationship for about two months. The night prior, they arrived home from being out, and, at about 1 a.m., they began arguing after defendant observed what he thought was information on Miller's phone that showed she was cheating on him. Defendant retained control of Miller's phone during the

argument. The verbal argument escalated to defendant throwing water bottles and alcoholic beverages at Miller and, eventually, to him hitting Miller. Defendant then choked Miller multiple times; she described the acts as occurring 50 times between 1 a.m. and 6:25 a.m. With one hand, defendant grabbed the front of her neck and squeezed and pushed. He also did this while pushing Miller to the floor and onto her back. Miller had trouble breathing. At one point, she reported, she felt that she was going to defecate. The choking incidents occurred in the family room and the floor of the guest bedroom.

¶ 10 Further, Miller related that she attempted to run out of the residence at one point; however, defendant pursued her and tackled her in the attached garage, held a knife to her neck while she was on the garage floor with him on top of her, and told her something to the effect of not to move or he would kill her. Defendant forced her back into the residence at knife point. From this moment on, there were about 20 to 25 times during which defendant put the knife to Miller's neck and threatened harm or death, including a jabbing motion where the tip of the blade made contact with Miller's neck.

¶ 11 At some point later, defendant told Miller that he wanted to have sexual intercourse. Miller did not believe she could say no, and they had sexual intercourse, which started in the guest room and moved to the family bedroom (the same bedroom where Miller had been choked, pinned down, kicked in the head, and held at knifepoint).

¶ 12 At 3:01 a.m., Miller sent a text message that stated "Help" to her sister's husband, Jack Settepani. However, he did not see the message until about 5:55 a.m., and the incident continued. Miller reported that she had just finished having intercourse with defendant when her sister, Stephanie Settepani, and Jack arrived at the residence. Jack's arrival allowed Miller to get her phone and call 911. Jack intervened and forced defendant out of the residence.

¶ 13    Upon entering Miller's residence, a deputy observed a bottle of an alcoholic beverage on the dining room table, a chair turned on its side, two open and empty water bottles on the floor, dried liquid (presumably an alcoholic beverage) on the floor, and other miscellaneous items thrown throughout the residence.

¶ 14    The synopsis further related that, on December 31, 2023, defendant was interviewed (with an interpreter) at the Kane County jail. He was Mirandized at about 9:30 a.m., and the interview was audio and video recorded. Defendant related that he and Miller had been in a relationship for about three months. On December 29, 2023, they went to a bar and consumed four drinks. Afterward, at about 12:15 a.m., December 30, 2023, they returned to Miller's residence. Defendant reported that he did not live with Miller but temporarily stayed with her while he fixed her vehicle. Inside the residence, defendant and Miller poured a drink and talked. Miller started talking about going out to lunch with a friend, and defendant looked at her phone messages because he feared she was cheating on him. Miller showed him the messages, and defendant noted that the messages were further down in the message history (indicating that they were older). He believed Miller lied to him and told her that the message would have been more recent if she had been making lunch plans with a friend. Defendant took Miller's phone and reviewed her messages. They began to batter each other.

¶ 15    Defendant provided the following timeline to police. Defendant was in the kitchen reviewing Miller's phone messages from men and was upset about her lying and cheating on him. He and Miller moved between the kitchen and dining room. Defendant advised that he consumed a large amount of alcohol, and Miller confessed to cheating on him and cried. At one point, they both sat by a door and Miller asked if she could get up and go to the couch. When she got up, she ran to the garage door. Defendant caught up to Miller and grabbed her by the arm and from behind

her back (in a bear hug) and forced her to go back inside the residence. Also, at one point, he grabbed Miller by the mouth, which he demonstrated to police. Defendant denied touching Miller on the neck. However, later in the interview, he admitted to putting his hand around Miller's neck so that she would look at him.

¶ 16    Defendant further related that, during the incident, Miller grabbed a knife, which prompted him to grab one as well. Miller asked defendant what he was doing, and he responded that he was using the knife to cut a lime. Defendant could not find a lime, however.

¶ 17    The synopsis also related that defendant stated that he thought about his daughters during the incident and realized he did some things wrong and did not want to cause any further damage. He also believed that Miller called her family at one point because her brother-in-law arrived and struck defendant in the face. Miller yelled at defendant to "get out of here," and he recalled bleeding a lot and an ambulance and police arriving.

¶ 18    Defendant stated that the last time the couple had intercourse was "Thursday night." He also reported that the incident was the couple's second altercation. The first one occurred during a Christmas party a few weeks earlier. When asked why Miller ran away from him, defendant posited that Miller feared getting hurt, as she was previously in a relationship with domestic violence.

¶ 19    The police synopsis also included a summary of an interview with Miller, which was conducted on December 31, 2023 at 10:30 a.m. Miller stated that, while at the bar on the evening before the incident, she and defendant each had two shots and three alcoholic beverages. Once at her residence, they poured an alcoholic beverage, played music, and talked about Miller's plans that she had made to meet a friend for dinner. Defendant did not trust her and believed she was not faithful. Miller explained that this was a miscommunication due to a language barrier.

Defendant misinterpreted what she said, and he took her phone and reviewed her browsing history. He saw that she had viewed another man's Facebook page, which upset him. Defendant returned Miller's phone to her, but argued about her not changing her relationship status on Facebook from "single" to "in a relationship." Miller reported that she did not allow defendant to hold her phone because he "smashed" a previous phone during a domestic incident on December 7, 2023 (the Christmas party that defendant had mentioned to police).

¶ 20    During the course of their argument about her relationship status on Facebook, defendant became enraged. Miller moved from the dining room table to the couch, at which point defendant pinned her down with his hand around her neck and yelled obscenities. Miller went to the kitchen and then made her way to the dining room to pour herself a drink. She and defendant sat at the dining room table, and defendant spoke about her lying to him. Miller responded that defendant misunderstood her.

¶ 21    Over the next two hours, between 1 a.m. and 3 a.m., defendant's emotions were up and down. He called Miller a liar and screamed at her to tell the truth, or poured a drink and was emotional. At one point, defendant picked up a dining room chair and motioned as if he was going to throw it at her. However, he put down the chair, but threw bottles and objects at her throughout the two-hour time span. Miller also stated that, on two occasions, defendant poured himself a drink but threw the contents onto her. He also grabbed her by the neck more times than she could track, reporting that there were an "uncomfortable" number of times defendant put his hand around her neck and causing shortness of breath. At about 3 a.m., defendant gave her back her phone and went to the bathroom. Miller texted Jack, "help." She then deleted the text and set her phone down as defendant exited the bathroom. Defendant announced that he was leaving, but remained in the residence. Miller stated that she was tired, and defendant insisted they go downstairs to the

basement (as this was their normal routine). However, Miller insisted they stay upstairs and sleep in the guest bedroom (because there was a firearm in the basement bedroom). She feared defendant would use the firearm against her. Defendant, angry, shoved Miller down the basement steps. A struggle ensued, and defendant got on top of Miller, yelled at her, and placed his hand around her neck, attempting to force her into the basement. Miller ran up the steps to the dining room table and told defendant she wanted to go to the guest bedroom. Defendant continued to scream that she was a liar and stated he hated her.

¶ 22 Once in the guest bedroom, defendant demanded that Miller lay down. She complied. Defendant yelled at Miller, and she sat up. Defendant then attacked her and pinned her down on the bed, placing his hand around her neck. Miller described the look on defendant's face as "pure rage." Miller could not breathe and felt she had to fight for her life. Her mouth became dry, and she asked for water. Defendant walked her to the kitchen. This occurred several times, and defendant argued all over again each time. At one point, Miller admitted to lying in an attempt to appease him, but defendant became angrier, stating "I wanna kill you, but I won't do that for the sake of my daughter's [sic] and Jesus. Thank Jesus and my daughters' [sic]." He had Miller repeat his words and showed her a tattoo image of Jesus on his arm.

¶ 23 Afterward, defendant asked Miller to pour him another alcoholic beverage (vodka and cranberry juice). While in the kitchen, defendant grabbed a steak knife, and Miller attempted to run away. She exited the residence through the garage, and, once outside, screamed for help. Defendant grabbed her arm and forced her back into the garage. In the garage, with the knife in his hand, defendant got on top of Miller and told her to "shut up." Miller stopped screaming, as defendant held the knife up to her neck and said, "If you move, I will kill you." Defendant then stood, closed the door, and told Miller to go back inside (while holding the knife to her body).

Twice, he pressed the knife to the left side of her abdomen, causing redness. Miller feared for her life, as defendant said on several occasions, "Shut up, or I'll kill you" and demanded she go back in the bedroom.

¶ 24    Once in the bedroom, defendant straddled over Miller, with his knees on her arms. Defendant threatened to stab her if she moved her hands. He pressed the tip of the knife into her neck, causing her pain. Defendant placed one hand around Miller's neck, and his other hand pressed the knife into her neck. Due to her inability to breathe, she fought to get defendant off her and they fell to the floor. Defendant regained control and held the knife to Miller's neck. Miller fought to breathe, and defendant stated, "This is the last time you are going to see me because you are going to die tonight." He stood and instructed Miller to stay on the floor and sit up against the wall.

¶ 25    Defendant then kicked, punched, and struck Miller with an open hand in the face and about her body, including her head, face, stomach, arms, and legs. Miller estimated that defendant kicked her in the head between 5 to 10 times. He also struck her forcefully in the eye. She was struck in the face about 20 times. Defendant instructed her to put down her hands or he would kill her. Miller continued to raise her hands to protect herself, and defendant continued to hold the knife blade against the front and side of her neck.

¶ 26    There were times when defendant allowed Miller to get up and use the bathroom, and there was a calm period when defendant cried about how hard his life is and how much he hated his mother. Miller attempted to console him by placing her hand on him, and defendant asked her to have sexual intercourse with him. At this moment, Miller saw her phone screen light up and realized it was Jack attempting to contact her. She tried to distract defendant, asking him, "are you going to hurt me?" He replied, "yes." He had the knife in his hand at this point. Miller believed

that, if she did not have sexual intercourse with defendant, she would be killed. Thus, she pretended that she wanted to have intercourse with defendant. Defendant set the knife on the dresser, and they got into bed. Miller got on top of defendant in order to draw his attention away from her phone, which was lighting up due to notifications from Jack. Miller then requested that they move to the living room couch, as the knife was very close in the bedroom and her phone created further problems. On the couch, they had intercourse. After about 15 minutes, Jack's vehicle pulled into her driveway.

¶ 27 Moments later, Jack entered the residence and called out for Miller. Miller exited the bedroom and ran away from defendant. Defendant ran after her, at which point Jack placed himself between Miller and defendant and shoved defendant to the ground. Defendant fell face first and lost one tooth. Stephanie, Jack's wife, and Jack yelled at defendant to exit the residence. Defendant left in his vehicle. Miller called 911. She went to Sherman Hospital and completed a sexual assault kit.

¶ 28 In support of its argument that the proof was evident and the presumption great that defendant committed the detainable offenses, the State tendered the police synopsis, which was admitted into evidence. The prosecutor also noted defendant's criminal history, including his DUI and his charge of alien inadmissibility into the United States. The State summarized the police synopsis and noted that Miller's interview was consistent with her version of the events when the police arrived at her residence. The State also noted that defendant admitted to taking Miller's phone and that he was upset because Miller lied to him and cheated on him. Next, arguing that defendant posed a threat to any person or the community, the State noted that defendant's actions were directed against his girlfriend of two months, the incident lasted several hours and involved him threatening the victim with a knife and preventing her from calling the police or from leaving.

Finally, the State noted that defendant had previously been deported and had returned from Honduras and that he had mentioned visiting his children in Honduras. Thus, he had a high likelihood of willful flight.

¶ 29   Defense counsel argued that any information concerning willful flight, specifically, deportation, was vague, and that there was no confirmation that defendant was aware of any outstanding warrant regarding his 2008 entry. Counsel also argued that defendant should be released with conditions. Counsel noted that defendant lives in Elgin with his brother-in-law and a friend, has been employed full-time for 4½ years in Batavia as a carpenter, and has no criminal convictions. The community and victim could be protected, counsel asserted, by placing defendant on electronic home monitoring (EHM) and GPS would assure others' safety.

¶ 30                                    B. Trial Court's Findings

¶ 31   The trial court granted the State's petition. First, the court found that the State had not established willful flight, where the fact that defendant has children who live in Honduras was not sufficient. Further the court found that it was unclear if defendant had a pending case concerning his entry into this country. The court noted that defendant got a DUI in 2019 and speculated that any warrant issued in 2008 would have been addressed at that point.

¶ 32   Next, the court determined that the State established that the proof is evident and the presumption great that defendant committed aggravated criminal sexual assault with a dangerous weapon, aggravated assault in a manner that threatened the life of the victim, aggravated domestic battery strangulation, aggravated unlawful restraint, and domestic battery. The court also found that the State established defendant's dangerousness as to Miller. It noted that it relied on the police synopsis, including Miller's statements to police at the scene and during her later interview. The court determined that Miller's statements were corroborated by the injuries to her face, head,

neck, arms, back, and the redness in her eyes. It also noted the state of the residence when police arrived, defendant's threats to kill Miller while committing sexual assault, and the repeated strangulations.

¶ 33 In determining that no conditions could mitigate the real and present threat defendant posed, the court noted that defendant held the victim against her will for hours and abused her for hours. GPS and EHM, it found, would not prevent him from going to the residence "and having a similar occurrence." The court determined that defendant's actions were driven by jealousy, which he essentially admitted.

¶ 34 Defendant filed a form notice of appeal. The Office of the State Appellate Defender was appointed to represent defendant and elected not to file a memorandum under Illinois Supreme Court Rule 604(h)(2) (eff. Dec. 7, 2023) (providing that the appellant "may file, but is not required to file, a memorandum"). The State, on March 12, 2024, filed a response in opposition to defendant's appeal.

¶ 35                                          II. ANALYSIS

¶ 36 In his form notice of appeal, defendant raises the following arguments. First, he argues that the State failed to meet its burden of proving by clear and convincing evidence that the proof is evident or the presumption great that he committed the charged offenses, where the court erred in finding that a police synopsis was sufficient evidence. Second, defendant checked a box, without providing any elaboration, arguing that the State failed to meet its burden of proving by clear and convincing evidence that no condition or combination thereof can mitigate the threat to any person or the community, based on the specific, articulable facts of the case, or defendant's willful flight. Third, defendant argues that the court erred in determining that no condition or combination thereof would reasonably ensure his appearance for later hearings or prevent him

from being charged with a subsequent felony or Class A misdemeanor, where the court failed to consider conditions such as EHM or GPS.

¶ 37    Article 110 of the Code, as amended by the Act, abolished traditional monetary bail in favor of pretrial release on personal recognizance or with conditions of release. 725 ILCS 5/110-1.5, 110-2(a) (West 2022). In Illinois, all persons charged with an offense are eligible for pretrial release. *Id.* §§ 2(a), 6.1(e). Under the Code, as amended, a defendant's pretrial release may only be denied in certain statutorily limited situations (qualifying offenses). *Id.* §§ 2(a), 6.1. For most of the qualifying offenses, upon filing a verified petition requesting denial of pretrial release, the State has the burden to prove by clear and convincing evidence that the proof is evident or the presumption great that the defendant has committed the offense (*id.* § 6.1(e)(1)), that the defendant's pretrial release poses a real and present threat to the safety of any person or persons or the community (*id.* §§ 6.1(a)(1)-(7), (e)(2)) or a high likelihood of willful flight to avoid prosecution (*id.* §§ 6.1(a)(8), (e)(3)), and that no condition or combination of conditions can mitigate the real and present threat to the safety of any person or the community or the risk of the defendant's willful flight from prosecution (*id.* § 6.1(e)(3)). Clear and convincing evidence is "more than a preponderance of the evidence and not quite approaching the beyond-a-reasonable-doubt standard necessary to convict a person of a criminal offense." *People v. Craig*, 403 Ill. App. 3d 762, 768 (2010).

¶ 38    We review a trial court's decision to detain a defendant using a two-part standard of review. We apply the manifest-weight standard to the trial court's factual determinations, including whether any conditions of release could adequately mitigate the risk defendant's release would present to the community. *People v. Trottier*, 2023 IL App (2d) 230317, ¶ 13. A finding is against the manifest weight of the evidence only when the finding is unreasonable. *In re Jose A.*, 2018 IL

App (2d) 180170, ¶ 17. The ultimate decision of whether a defendant should be detained is reviewed for an abuse of discretion. *Trottier*, 2023 IL App (2d) 230317, ¶ 13. An abuse of discretion occurs only if no reasonable person could agree with the trial court. *People v. Williams*, 2022 IL App (2d) 200455, ¶ 52.

¶ 39  First, we reject defendant's argument that the trial court erred in relying on the police synopsis in determining that the State met its burden to show that the proof is evident or the presumption great that defendant committed the charged offenses. This argument has been repeatedly raised by defendants in detention cases and consistently rejected on review. See, *e.g.*, *People v. Horne*, 2023 IL App (2d) 230382, ¶ 24 (finding that the police synopsis is sufficient to meet the State's burden); see also *People v. Mancilla*, 2024 IL App (2d) 230505, ¶ 34. The Act explicitly permits the State to present evidence "by way of proffer based upon reliable information." 725 ILCS 5/110-6.1(f)(2) (West 2022). Also, the Act exempts detention hearings from the rules of evidence. *Id.* § 6.1(f)(5). Accordingly, we find defendant's argument unavailing.

¶ 40  Defendant's second argument, for which he provided no elaboration in his notice of appeal, is that the State failed to meet its burden of proving by clear and convincing evidence that no condition or combination thereof can mitigate the threat of to any person or the community, based on the specific, articulable facts of the case, or defendant's willful flight.

¶ 41  "Rule 604(h) requires the notice of appeal to include a description of the relief to be requested '*and the grounds for the relief requested*.' " (Emphasis in original.) *People v. Inman*, 2023 IL App (4th) 230864, ¶ 12 (quoting Ill. S. Ct. R. 604(h)(2) (eff. Sept. 18, 2023)). Accordingly, "some form of argument is required, along with justification for claiming entitlement to relief—like references to the record, the evidence presented, or, if possible, legal authority." *Id.* A reviewing court "cannot be expected to formulate an argument for defendant out of whole cloth."

*Id.* ¶ 13. Further, "[t]he appellate court is not a depository in which the appellant may dump the burden of argument and research." *Thrall Car Manufacturing Co. v. Lindquist*, 145 Ill. App. 3d 712, 719 (1986). We are entitled to have the issues clearly defined, pertinent authority cited, and a cohesive legal argument presented. *Walters v. Rodriguez*, 2011 IL App (1st) 103488, ¶ 5. Because he failed to provide argument and justification therefore, defendant's argument is forfeited.

¶ 42 Even assuming, *arguendo*, that defendant's argument is not forfeited, we conclude that the trial court's findings were not unreasonable. Where the trial court finds that the State proved a valid threat to the safety of any person or the community, the court must determine which pretrial release conditions, "if any, will reasonably ensure the appearance of a defendant as required or the safety of any other person or the community and the likelihood of compliance by the defendant with all the conditions of pretrial release." 725 ILCS 5/110-5(a)(1)-(6) (West 2022). In reaching its determination, the trial court must consider: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; (4) the nature and seriousness of the specific, real, and present threat to the safety of any person or the community that would be posed by the defendant's release; (5) the nature and seriousness of the risk of obstructing or attempting to obstruct the criminal justice process that would be posed by the defendant's release; and (6) when a person is charged with, as relevant here, domestic battery, the court may consider certain additional factors. *Id.* The additional factors a court may consider when a defendant is charged with domestic battery include: (1) whether the alleged incident involved harassment or abuse as defined in the domestic violence statute; (2) whether the defendant has a history of domestic violence or a history of other criminal acts; (3) the defendant's mental health; (4) whether the defendant has a history of violating court orders;

(5) whether the defendant has been or is potentially a threat to any other person; (6) whether the defendant has access to deadly weapons or has a history of using deadly weapons; (7) whether the defendant has a history of abusing alcohol or any controlled substance; (8) the severity of the alleged incident; (9) whether a separation from the victim of abuse or a termination of the relationship between them has recently occurred or is pending; (10) whether the defendant has exhibited obsessive or controlling behaviors toward the victim; (11) whether the defendant has expressed suicidal or homicidal ideations; and (12) any other factors the court deems have a reasonable bearing upon the defendant's propensity or reputation for violent, abusive, or assaultive behavior, or lack of that behavior. *Id.* § 110-5(a)(6).

¶ 43    In determining that no conditions could mitigate the real and present threat defendant posed, the court noted that defendant held the victim against her will and abused her for hours. GPS and EHM, it explicitly found, would not prevent him from going to the victim's residence "and having a similar occurrence." The court determined that defendant's actions were driven by jealousy, which he essentially admitted. The synopsis clearly supported these findings, as it related the victim's extensive injuries arising out of an argument during which defendant accused her of cheating on him. (Defendant admitted that he believed the victim was cheating on him and that he was upset about it.) Defendant allegedly threw objects at the victim, attempted to choke her (to the point that she had trouble breathing) multiple times (and admitted to putting his hand around her neck), ran after her when she tried to escape from the residence (which he admitted), held a knife to her neck multiple times, threatened to kill her, and sexually assaulted her. Defendant admitted that the couple had a prior altercation a few weeks earlier. The victim's later interview, as the trial court found, was consistent with her statements at the scene. In all, the record reasonably supported the trial court's findings.

¶ 44 Defendant's final argument is that the trial court erred in determining that no condition or combination thereof would reasonably ensure defendant's appearance for later hearings or prevent him from being charged with a subsequent felony or Class A misdemeanor, where the court failed to consider conditions such as EHM or GPS. We agree with the State that this ground for relief applies to cases involving revocation of pretrial release and, thus, does not apply here. 725 ILCS 5/110-6(a) (West 2022). In any event, we reject this argument because it is contradicted by the record. As noted, the trial court explicitly considered and rejected EHM and GPS. It also found that defendant held the victim against her will and abused her for hours and that GPS and EHM would not prevent defendant from returning to the victim's the residence.

¶ 45                                   III. CONCLUSION

¶ 46 For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 47 Affirmed.