2024 IL App (1st) 240535-U

No. 1-24-0535B

Second Division
May 22, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| | ) | Appeal from the |
| THE PEOPLE OF THE STATE OF | ) | Circuit Court of |
| ILLINOIS, | ) | Cook County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | No. 24 CR 0269201 |
| v. | ) | |
| | ) | |
| MISHA RUSSELL, | ) | Honorable |
| | ) | Ruth I. Gudino |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the circuit court's order denying defendant-appellant's pretrial release where the court found the State had met its burden on all three elements of its detention petition.

¶ 2    On February 26, 2024, defendant-appellant, Misha A. Russell, was arrested and charged with a forcible felony, specifically first degree murder with intent to kill or do great bodily harm of the victim, Gerald Rhymes, pursuant to section 9-1(a)(1) of the Code of Criminal Procedure of

2012 (720 ILCS 5/9-1(a)(1) (West 2024)). Defendant was also charged with unlawful possession of the victim's stolen vehicle, a Class 2 felony, pursuant to section 5/4-103 of the Illinois Vehicle Code (625 ILCS 5/4-103(a)(1) (West 2024)).

¶ 3    On February 28, 2024, the State filed a verified petition for a pretrial detention hearing pursuant to articles 110-2 and 110-6.1 of the Code of Criminal Procedure of 1963 (Procedure Code) (725 ILCS 5/110-2, 110-6.1 (West 2022)), as amended by Public Act 101-652, commonly referred to as "the Safety, Accountability, Fairness, and Equity-Today (SAFE-T) Act" or the "Pretrial Fairness Act" (Act). See Pub. Acts 101-652, § 10-255 (eff. Jan. 1, 2023); 102-1104, § 70 (eff. Jan. 1, 2023); Ill. S. Ct. R. 604(h)(1) (eff. Oct. 19, 2023); *Rowe v. Raoul*, 2023 IL 129248, ¶ 52 (lifting stay and setting effective date as September 18, 2023). After appointing counsel for defendant and hearing argument on the petition, the circuit court granted the State's request.

¶ 4    On appeal, defendant argues that the circuit court erred in ordering pretrial detention when it found that the State had met its burden on all three elements of its petition. For the reasons that follow, we affirm the decision of the circuit court.

¶ 5                                        I. BACKGROUND

¶ 6                                  A. Pretrial Detention Petition

¶ 7    On February 28, 2024, the State filed its verified petition for pretrial detention.[1] Therein, the State argued that the charged offense of first-degree murder was a non-probationable and

---

[1]We initially note that portions of the State's form order petition for pretrial detention is not contained in the record on appeal. Specifically, with regard to the second element as to whether defendant posed a real and present threat to the safety of any person, persons, or the community, the State wrote "see attached addendum." However, the addendum was not attached to the petition. Both parties acknowledge that it is missing from the record. We discuss the effect of this missing document later in our disposition. We also observe that the record does not contain any filing by the pretrial services division assessing defendant's criminal activity as has been filed in other detention cases.

forcible felony eligible for pretrial detainment pursuant to sections 110-6.1(a)(1) and (a)(5) of the Code (725 ILCS 5/110-6.1(a)(1), (a)(5) (West 2024)); (2) defendant posed a "real and present threat to the safety of any person or persons or the community;" and, (3) there were "[n]o condition or combination of conditions set forth in 725 ILCS 5/110-10(b) [725 ILCS 5/110-10(b) (West 2024) *** to mitigate that risk."

¶ 8                          B. Pretrial Detention Hearing

¶ 9     On February 28, 2024, defendant appeared before the circuit court for the first time for, among other matters, a hearing on the State's petition. The court appointed a public defender for defendant and swore in the prosecuting assistant state attorney under oath. The State indicated to the court that it had tendered its pretrial detention disclosures to defense counsel prior to the hearing, which included: (a) a copy of the petition; (b) a written copy of the State's "oral proffer"; (c) 33 pages of documents, which included law enforcement reports, arrest reports, defendant's criminal background, and a Law Enforcement Agencies Data System (LEADS) report; (d) three videos that included defendant's statement to police after she was advised of her *Miranda* rights; and (e) a fourth video containing a statement from Annette Drummer.[2] Defense counsel subsequently acknowledged receipt of these items, indicated that he had a "meaningful opportunity" to speak with defendant, and was ready to proceed.

¶ 10    The court asked the State to proceed both on its petition and on "*Gerstein*"[3] in its proffer. In response to defense counsel's inquiry, the State indicated, and the court confirmed, that its "two-page addendum" was part of the State's proffer.

---

[2]None of these documents or videos are contained in the record on appeal. It is also unclear who Annette Drummer is.

[3]"Gerstein" refers to *Gerstein v. Pugh*, 420 U.S. 103, 112, 125 (1975), in which the United States Supreme Court held that a defendant arrested without a warrant and charged by information must be

¶ 11                                     1. The State's Proffer

¶ 12    In support of its petition, the State proffered the following.[4] On February 25, 2024, at approximately 8:22 p.m., law enforcement conducted a well-being check at a residence located at 3718 West 168th Street in Cook County, Illinois. The request had been made by the victim's daughter, who had been unable to make contact with her father via phone or text. Upon arrival at the residence, officers observed through a window on the home's main level that a television was on with the volume turned up. Officers repeatedly knocked on the front door and received no response.

¶ 13    One officer observed that a bedroom window was slightly open and elevated. He then shone a flashlight into the bedroom in an attempt to make further contact with anyone inside, but did not receive a response. The officer then held his body-worn camera up to the window and used its live feed to check inside the room. Through the feed, he was able to observe a blanket on the floor in the corner of the bedroom with a body underneath it. Subsequently, the officer summoned medical assistance and additional officers on his radio.

¶ 14    Upon arrival of the additional officers, they entered the residence and proceeded to the bedroom. In the bedroom, which was in disarray, officers found the victim lying on the floor with his head exposed and his body covered by a blanket. The victim appeared to be deceased, with his hands and feet were tied together with neckties. A wooden desk leg was found near his body.

---

promptly presented before a neutral magistrate for a determination as to whether probable cause for arrest exists.

[4]Normally, we combine the State's factual proffers from both the hearing and the written materials contained in the record together for purposes of efficiency. However, as indicated before, there are no details actually concerning the State's written proffer beyond the form order petition, so we must solely rely on the State's oral proffer.

Officers also found a three-year-old girl sitting on the bed, who they later determined was the victim's daughter. Officers removed the child from the home and waited for paramedics to arrive.

¶ 15    Upon arrival, the paramedics pronounced the victim dead and transported him to the medical examiner's office.  The cause of death was later determined to be homicide resulting from blunt force trauma and bleeding on the brain. Later in the hearing, the State noted that the victim had been either 58 or 59 years old at the time of death. Although it did not know the victim's height and weight, the State indicated that, per a 2018 police report, defendant was five foot seven inches and weighed 185 pounds.

¶ 16    Upon further investigation at the home, detectives discovered that the victim owned a black 2002 Toyota Avalon, which was not at the residence. However, on February 26, 2024, detectives located the victim's car using a license plate reader. The car was purportedly located between Polk Street and Kilpatrick Avenue in Chicago. Officers found defendant in the victim's car and placed her into custody. Officers then searched the vehicle and retrieved a stun gun, a metal pipe, a wig, and bloodied clothing hidden in various parts of the car. Once at the police station, defendant was advised of her rights. Defendant initially denied any knowledge of the murder, the victim, and where she had found the car. Defendant then recanted her statement and spoke to officers.

¶ 17    According to defendant, the victim was her "sugar daddy" who she had known for about a month. On the date of the incident, the victim invited her to his home via text. Once she arrived, she sat in the living room and the victim asked her to have anal sex with him. She refused and told him she was going to leave. The victim then retrieved a metal pipe to block her from exiting the home. He swung at her with the pipe, but she was able to take it from him and began striking him all over his body. A scuffle continued, and the two ended up in the victim's bedroom. Defendant continued to strike the victim until he was on the ground and at some point used a Taser on him.

She further admitted that she was "stronger" and "larger" than the victim. After the fight, defendant remained in the victim's home for a few hours. She admitted to looking through his wallet for money but did not find any. She then "panicked," found his car keys, and took his phone so he could not call the police. Before she left, she also used neckties to bind his hands and feet to prevent him from calling for help.

¶ 18    Following the State's proffer, the court determined that there was probable cause pursuant to *Gerstein.* The State confirmed that it was relying on the same proffer to support its detainment petition, and subsequently provided evidence of defendant's criminal background. According to the State, defendant had been arrested three separate times in 2018. One arrest stemmed from domestic battery, which was "Soled."[5] Another arrest was for battery, for which she was convicted and served three days in prison. The final arrest was for resisting and battery, which was also "Soled." The State further indicated that defendant had a warrant from 2019, which had been related to one of her misdemeanor offenses. Upon further investigation during the hearing, the State confirmed that the victim here had not been a complainant in any of those prior incidents.

¶ 19                                      2. Pretrial Services Assessment

¶ 20    A representative from "pretrial services" indicated that defendant's "new criminal activity" score was a "2," a "3" for "failure to appear," and a "yes" on the "violence flag" based on the nature of the pending charges. [6] The representative further indicated that the scores correlated to a "supervision level 3," which equated to a recommendation for "maximum conditions."[7]

---

[5]The State's addendum, which we have noted is not in the record, apparently chronicled defendant's prior criminal history and the facts of the "Soled" charges. Although we presume to know the meaning of "Soled," absent the addendum, we decline to ascribe any meaning to the acronym here.

[6]We observe that the representative was not individually sworn in under oath.

[7]It is not apparent in the record what such pretrial supervision levels mean for purposes of our review.

¶ 21                      3. Defendant's Argument in Mitigation and for Pretrial Release

¶ 22      In mitigation, defense counsel asserted that defendant was 29 years old and a lifelong Cook County resident. Defendant currently lived in Matteson with her parents, graduated from Rich Central High School in 2012, and had attended some college. She was currently unemployed but was scheduled to begin a job within the next week as a caregiver at "Assisting Hands." She had also previously worked as a manager at Journey's in Orland Park Mall until December 2023, and had also worked at an "aftercare" childcare program at an indeterminate time. Defendant was significantly involved in her church as a youth minister, volunteered at women's shelters and food drives, and had been on a missionary trip to Benin, Africa. Defense counsel asserted that defendant did not have a history of serious violence, with her sole past conviction being a misdemeanor.

¶ 23      Defense counsel further indicated that defendant had been a victim of "serious violence," including "significant domestic abuse" by a "number of men," and as a result suffered from post-traumatic stress disorder and other mental health issues. Upon questioning by the court, defense counsel acknowledged that he did not have documentation to support this, but knew that defendant attended therapy with a psychiatrist on a weekly basis. Defense counsel further confirmed that defendant's relationship with the victim had been about a month long, and he did not know whether the victim had abused defendant in the past.

¶ 24      In arguing that the State could not meet its burden on the first element of the petition, defense counsel clarified that he was not challenging whether the charges were detainable offenses, but rather took issue with the State's proffer, which he argued was unreliable and unsupported by the documents tendered to him in discovery. Specifically, defense counsel pointed to "paragraph four" of the State's addendum regarding the search of the victim's car. Defense counsel indicated

that he had not been tendered any reports concerning the vehicle's recovery, its subsequent search, or any narratives regarding defendant's arrest.

¶ 25    The State responded, asserting that it had met its obligation to turn over any documents in its possession. It further confirmed that it did not have an "approved narrative" from law enforcement regarding defendant's arrest, as this was a "new case." However, the State indicated that, under the Procedure Code, it could proceed on its petition by proffer so long as the facts were based on a reliable source. The State asserted that the proffer was reliable as it had been "taken" by colleagues in the felony review division. Finally, the State noted that it had provided a copy of its "oral proffer" to defense counsel, even though it was not required to do so under the Procedure Code. The court indicated that it would note defense counsel's objection for the record.

¶ 26    Next, defense counsel challenged the State's contention that defendant posed a real and present threat. Although he acknowledged the tragedy of the situation, defense counsel characterized defendant's actions as "reasonable" and "in self-defense." According to defense counsel, the victim had been the initial aggressor when he utilized a metal pipe to block defendant's exit and attempted to attack her after pressuring her into nonconsensual sexual activity. Defense counsel pointed out that it was unclear as to when defendant left the victim's home, but, based on the State's proffer and his own communications with his client, the victim had been conscious and breathing at the time she left. According to defendant, she had further told police that she had never fought back against an abuser and did not believe she had assaulted him with "extra violence other than what she thought she needed to [do to] protect herself." With regard to the victim's tied hands and feet, defense counsel characterized these actions as indicative of defendant being "fearful" and wanting to ensure that he could not continue to harm her. Defense counsel reasoned that defendant would not have tied the victim up had she believed he was already dead.

¶ 27    Finally, defense counsel argued that any threat or danger could be mitigated by electronic monitoring and pretrial services such as monitored curfew, conditions to maintain her weekly therapy sessions, and a requirement to continue any prescribed medications. The court questioned whether electronic monitoring could be imposed without an "identifiable victim," given that the victim was dead. Defense counsel responded that the court was "correct about monitoring" and maintained that defendant was not a threat.

¶ 28                                  4. The State's Reply

¶ 29    In addressing the first element of the petition, the State agreed with defense counsel that there were "certain portions" of its proffer which "len[t] some credibility" to defendant's claim that the incident "may have started out as self-defense." Nevertheless, the State maintained that there was no evidence to support the theory that the victim was the original aggressor other than defendant's statements to police. The State also acknowledged that it was unclear as to whether the victim had been unconscious or deceased while defendant remained in the home, and that some of defendant's statements suggested that he might have still been alive. However, the State pointed out, defendant's actions indicated that even if he had been alive, she had still left him there to die by tying him up to prevent him from moving or calling the police, and she also had not reported the incident. The State further reiterated that defendant had also gone through the victim's home and clothes for money, and eventually stole his car. This, the State reasoned, were actions that went beyond the claim of self-defense because, even if not intentional, defendant knew "at the very least" that he was going to die.

¶ 30    Regarding the last two elements of the petition, the State also conceded that, under the Procedure Code, the court could consider defendant's psychological state, and that based on her statements to police, defendant claimed to suffer from post-traumatic stress disorder or a

dissociative personality disorder. However, the State reasoned that such psychological history actually supported the finding that defendant was a threat which could not be mitigated by any conditions such as curfew or electronic monitoring. The State indicated that in statements to police, defendant had referred to herself as a prostitute and the victim's stolen car as her "pimp's vehicle."[8] Thus, the State concluded, without pretrial detention, there was a risk that defendant would reach out to other men and engage in similar conduct if she was triggered by any of their advances.

¶ 31    Prior to the conclusion of the hearing, the following exchange occurred between the court and the parties:

> "THE COURT: Okay. Now, [defense counsel], in your argument, you had stated at the time that the defendant left the home, she was not sure that the victim had [died]. She's charged currently with first-degree murder, which is a detainable offense. But would the parties agree that if her belief at the time was that he hadn't passed, at a minimum, there had been an aggravated battery deadly weapon [offense] already offended—committed, and that is in and of itself a detainable offense?
>
> [DEFENSE COUNSEL]: Your Honor, if I could just—I prefer not that she just wasn't sure if he was dead, that she told the police that he was indeed conscious at that time. And as to your question, I would argue that depending on the affirmative defense of self-defense—

---

[8]Defense counsel objected to this line of argument, which the court overruled, noting that if such statements had been included in the discovery tendered to defense counsel, the State could use them in support of its petition.

THE COURT: I'm not talking about affirmative defenses. The charge itself—there is an aggravated battery deadly weapon, which would be the metal pipe in this case, which would make it a deadly weapon—is a detainable offense in and of itself.

[DEFENSE COUNSEL]: Aggravated battery with a deadly weapon I believe is a detainable offense.

THE COURT: And would you agree?

[THE STATE]: State would agree."

¶ 32                                    C. Ruling

¶ 33    At the conclusion of the hearing, the court orally granted the State's petition and denied pretrial release. With regard to the first element, the court found that "the proof [was] evident and the presumption great that the defendant [had] committed an eligible offense," namely first degree murder, a forcible felony. In doing so, the court readdressed its previous line of questioning concerning the hypothetical offense of aggravated battery, and further stated that "[i]f you go along with the argument and position of the defense stating that [defendant] believed him to be alive at the time she left, then we have aggravated battery deadly weapon, which is also an eligible detainable offense in this case."

¶ 34    Next, with regard to the second element, the court made the following findings:

THE COURT: "We then have to turn to whether or not the defendant poses a real and present threat to the safety of any person or persons or the community based on specific articulable facts.

This [c]ourt has heard through the proffer—and I will note that counsel made an objection regarding the evidence that was recovered in the vehicle. So, at this time, without

considering that paragraph, the [c]ourt considers several factors on the topic of dangerousness. First and foremost, the nature and circumstances of an offense charged involving a weapon. This is a first-degree murder where there has been medical—medical findings that the manner—that the cause of death was multiple blunt force trauma and bleeding on the brain and the manner of death was homicide, and the weapon alleged to have been used in this case was a metal pipe.

The history and characteristics of the defendant, alright, there is in the background of the defendant that the [c]ourt has heard, a 2018 battery conviction for three days. There is an arrest for domestic battery and an arrest for resisting. While it [was] in 2018, those I still will take into consideration as to indicative of possibly an assaultive behavior on her behalf.

There is evidence of the defendant's psychological, psychiatric history, which indicates that she has been the victim of a crime, but I have no evidence before me that there [were] any reported instances in this one-month relationship she had with, what she referred to the victim as her quote, unquote, her sugar daddy.

In addition, the statements weigh heavily on this [c]ourt that the defendant made. In the statements that the defendant made is that the defendant observed the victim get the metal pipe, he blocked her from exiting [the] home, and swung at the defendant with the pipe. I have no indication that there was contact, that she was beat, that she was knocked to the ground, that she was struggling. And then she took the pipe and then began striking him all over the body.

Somehow this incident then went into the bedroom of the victim where a minor child was present, a three-year-old, who, according to the statement, was present during

this incident. She admitted to tasing him so she could overpower him. She admitted to hitting him and bounding him to ensure that he did not call the police on her. That seems to me to be evident of someone who knows what they're doing and doesn't want to be caught. She talks about how she's a black belt[] [in] karate and her hands are lethal, but she didn't use her hands. She used a metal pipe, beating this individual, our victim, to the point where he had multiple blood—blunt force trauma and bleeding on the brain.

In addition, the victim in this case is approximately at least 25 to 30 years older. There [are] allegations in the statement made by the defendant that she utilized a Taser to overpower him.

So I do believe that the State has met by clear and convincing evidence that the defendant poses a real and present threat to the safety of person or persons or the community. I think she poses a threat to this three-year-old, who is—

\*\*\*     \*\*\*     \*\*\*

To this three-year-old who had to witness her father being beat at the hands of this defendant. I believe she is a risk to the community as a whole based on the escalation of exhibited violent behavior, and the beating of this individual in their home."

¶ 35    Last, with regard to the third element, the court made the following findings:

THE COURT: "Now, the third prong is whether or not there is any condition or combination of conditions set forth that can mitigate the real and present threat to the safety of any person or persons or community based on the specific articulable facts of this case.

Now, the [c]ourt is not missing—or minimizing whatever defenses can be asserted in this case, but at this juncture, I have to determine what conditions or combination of conditions can mitigate the real and present threat that I believe [defendant] poses on the

community, on this three-year-old victim, and in fact, posed to the victim in this case. And I have to weigh the evidence in this case. I have to weigh the statements, and I have to weigh the protection of the community. Now, there has been a representation by way of proffer in that there was evidence recovered in this case, but what is extremely telling is the evidence of a defendant's statement that was audio recorded in which she lays out how this incident occurred.

[Electronic monitoring] is available if there's a specific identifiable victim. Unfortunately, the specific identifiable victim in this case is dead, so I don't believe electronic monitoring would mitigate a real and present threat that this defendant poses to other persons or the community or other men, or quote, unquote, other sugar daddies that she may acquire if released.

Based on that, I believe that the State has met [its] burden, clear and convincing evidence, as to the elements in this case. Based on that, I am going to do the following: [a]fter hearing proffered arguments and testimony, argument by both sides, the [p]etition to [d]etain is granted."

¶ 36    The court's written ruling, which substantially mirrors its oral ruling in summary form, was entered on that same date.[9] This appeal followed.[10]

---

[9]We observe that, with regard to the findings regarding conditions, the court further found that defendant displayed "disregard for the victim's life by bounding him and taking his phone to prevent him from calling the police."

[10]Here, the record reflects that on March 12, 2024, defendant timely filed a notice of appeal from the court's February 28, 2024, interlocutory order denying pretrial release. See 725 ILCS 5/110-5(k) (West 2024); see also Ill. S. Ct. R. 604(h), (h)(1)(iii), (h)(2) (eff. Oct. 19, 2023). During briefing, our supreme court amended Rule 604(h) (eff. April 15, 2024), which now provides that dispositions concerning pretrial release decisions shall be issued within 100 days of the filing of the notice of appeal. However, we have adhered to the previous deadlines set forth in the rule prior to amendment, which required our resolution of this case by the date of issuance.

¶ 37                                    II. ANALYSIS

¶ 38                              A. The Procedure Code

¶ 39    As we have on more than one occasion set out with specificity the requirements of the Procedure Code (see *People v. Parker*, 2024 IL App (1st) 232164, ¶¶ 34-42; *People v. Brown*, 2024 IL App (1st) 231996-U, ¶¶ 27-38), we set forth dictates of the Code only generally here.

¶ 40    The Code now presumes that all persons charged with an offense shall be eligible for pretrial release prior to conviction. 725 ILCS 5/110-2(a); § 110-6.1(e) (West 2024). Therefore, "[p]retrial release may be denied *only* if a person is charged with an offense" as delineated within section 110-6.1 of the Procedure Code, and if the court has conducted a corresponding hearing. (Emphasis added.) *Id.* §§ 110-2; 110-6.1(e)-(f). Pretrial detention should only be ordered to effectuate the Act's goals, which include reasonable assurance of an eligible person's appearance in court, ensuring the safety of any other person or the community, the prevention of any attempt or obstruction of the criminal justice process, and ensuring compliance with all conditions of release. *Id.* § 110-2(e).

¶ 41    The State will trigger the requirement for a pretrial detention hearing upon its timely filing of a verified petition for detainment. *Id.* § 110-6.1(a). The State must prove three elements in its petition, which it bears the burden of proving by clear and convincing evidence. *Id.* § 110-6.1(e). First, it must show that the "proof is evident or the presumption great" that the defendant has committed an eligible detainable offense. *Id.* § 110-6.1(e)(1). Second, the State must show that a defendant "poses a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts [of their case]," which may include conduct involving a forcible felony, the obstruction of justice, intimidation, injury, or abuse. *Id.* § 110-6.1(a)(6), (e)(2). Third, the State must allege that there is "no condition or combination of conditions set forth"

within the Procedure Code that could mitigate that real and present threat to the safety of any person, persons, or the community, based on the facts of the case. *Id.* § 110-6.1(e)(3). The State may utilize evidence of a defendant's available criminal history, any written or recorded statements, police reports, and evidence "by way of proffer based upon reliable information." *Id.* § 110-6.1(f)(1), (2); see also *id.* § 110-6.1(f)(5) (evidentiary admissibility rules for criminal trials do not apply to pretrial detention hearings).

¶ 42    Following the petition's filing, the circuit court must hold a hearing. See *id.* §§ 110-6.1(a), (c), (f). In addition to evaluating the merits of the petition, if the charged offense is a felony, the court must also assess "whether there is probable cause the defendant has committed [the charged] offense[.]" *Id.* § 110-6.1(b). If there is no such finding, the defendant must be released. *Id.* The court may utilize statewide risk-assessment tools to evaluate the likelihood of a defendant's appearances at future court proceedings or if the defendant poses a real and present threat. 725 ILCS 5/110-6.4 (West 2024). Each decision regarding pretrial release is individualized, and no single factor or standard is determinative. *Id.* § 110-6.1(f)(7). If the court determines that there is probable cause and that the State has met its burden on its petition, the court must make a written finding summarizing its reasons for pretrial detention. *Id.* § 110-6.1(h).

¶ 43    With this framework in mind, we now turn to the merits of defendant's appeal.[11]

---

[11]After filing a timely notice of appeal, the Office of the State Appellate Defender (OSAD) declined to file a memorandum pursuant to Rule 604(h) (eff. Oct. 19, 2023). Instead, OSAD filed a "Notice Filed in Lieu of Rule 604(h) Memorandum." Prior to our supreme court's amendments of Rule 604(h)(2), appellant was allowed to file either a memorandum or a "response to the Notice of Appeal." The filing asserts that the notice of appeal filed by defendant's appointed counsel in the circuit court was sufficient to outline defendant's claims on appeal, but also expounds upon some bases for reversal. We will consider both in our review of the appeal. See, *e.g.*, *People v. Acosta*, 2024 IL App (2d) 230475, ¶ 16 (issues raised only in notice of appeal, and not expressly argued in memorandum, are forfeited); *People v. Forthenberry*, 2024 IL App (5th) 231002, ¶¶ 41-43 (noting that memorandum dictates review on appeal); *People v. Rollins*, 2024 IL App (2d) 230372, ¶ 22 (defendant abandoned claims raised in notice of appeal but did not address in accompanying memorandum). In doing so, we remind the parties of their respective professional

¶ 44                                    B. Standard of Review

¶ 45     In her Rule 604(h) notice, defendant asserts that the State's burden on its petition, clear and convincing evidence, is a higher burden of proof than a preponderance of the evidence but does not expressly indicate which standard is applicable on appeal. In contrast, although agreeing that its burden on the petition is clear and convincing evidence, the State argues that the applicable standard of review on appeal is abuse of discretion.

¶ 46     We acknowledge the yet unresolved debate among the appellate districts, and even among the divisions in the First District, concerning the appropriate standard of review. See *Parker*, 2024 IL App (1st) 232164, ¶ 43 (discussing and collecting cases on court split). Absent direction from our supreme court on this significant issue, we continue to find *People v. Saucedo*, 2024 IL App (1st) 232020 persuasive and therefore, continue to follow it. Therein, our court stated that "[r]eview of the decision to grant or deny a detention petition under section 110-6.1 of the Code requires a mixed standard of review" because the circuit court's decision involves consideration of "three propositions." *Id.* ¶ 31. The court noted that, with regard to the first two elements of the detention petition—whether "the presumption raised that the defendant committed a detainable offense" and whether "the defendant poses a threat to a person or the community"—are ultimately "questions of fact that require a certain quantum of evidence: clear and convincing." *Id.* Additionally, the court observed, the factors used to consider whether the defendant poses a threat is based on the defendant's background, and therefore are "matters of historical fact." *Id.* Thus, the court reasoned, because such determinations are ultimately questions of fact, the manifest weight

---

obligations to provide legal and factual support for their contentions under the Act and the rules of professional conduct. See *People v. Mancilla*, 2024 IL App (2d) 230505, ¶¶ 31-34.

of the evidence standard applies. *Id.* ¶¶ 32, 35; see *People v. Reed*, 2023 IL App (1st) 231834, ¶ 24.

¶ 47    The first two elements of the petition do not permit the circuit court to exercise discretion on what *may* be considered. Rather, the statute is clear as to what facts should be utilized in determining whether there was, by clear and convincing evidence, a sufficient showing that the requisite detainable offense was committed, as well as the defendant's level of dangerousness based on the facts of the alleged crime and relevant background information. These determinations ultimately require the circuit court's resolution of the State's factual proffer. See *Reed*, 2023 IL App (1st) 231834, ¶ 24 (applying manifest weight of the evidence standard to whether a defendant committed the charged offense and if he posed a danger to the community). As such, we too find that the manifest weight of the evidence standard is appropriate for the first two elements of the petition. In reviewing both issues, we note that "[a] finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." (Internal quotation marks omitted.) *People v. Stock*, 2023 IL App (1st) 231753, ¶ 12.

¶ 48    We also agree with *Saucedo* that the third element of the petition, concerning potential conditions of release, is subject to an abuse of discretion standard. 2024 IL App (1st) 232030, ¶ 36. This is because the third element involves a "trial judge's reasoning and opinion," which requires the court to "exercise a degree of discretion to determine whether any less restrictive means will mitigate the threat a defendant poses to a person or the community." *Id.* Specifically, courts are " 'endowed with considerable discretion' " to "weigh and balance a multitude of factors and arrive at a decision that promotes not only 'principles of fundamental fairness' but [also] 'sensible and effective judicial administration.' " *Id.* (quoting *Reed*, 2024 IL App (1st) 231834, ¶

30). Thus, when considering whether the circuit court's determination on the conditions of release factor was proper, we are mindful of the level of discretion afforded to such findings, where a circuit court's decision is only found to be an abuse of discretion where it is "arbitrary, fanciful, or unreasonable, or where no reasonable person would agree with the position adopted by the [circuit court.]" *Saucedo*, 2024 IL App (1st) 232020, ¶ 36.

¶ 49    Having set forth the statutory scheme in accordance with the applicable standards of review afforded to each element of the petition, we now turn to the merits of the appeal.

¶ 50                                C. Arguments

¶ 51                              1. Detainable Offense

¶ 52    In her form-order notice of appeal, defendant checked the box concerning this element, and stated that the "State failed to meet its burden of proving by clear and convincing evidence that the proof is evident or the presumption great that defendant committed the offense(s) charged." Defendant argues that, in its oral ruling, "the [c]ourt erred by relying on an uncharged offense as the basis for detention." Additionally, she contends, the State failed to meet its burden regarding first degree murder as the proffered evidence did not demonstrate that she had an intent to kill or cause great bodily harm to the victim. Specifically, defendant notes that the "proffered *** evidence was that after [defendant] denied the victim's sexual advances, he blocked her exit and swung a metal pipe at her. [Defendant's] alleged actions were done in self-defense and with the intent of escaping safely, not causing great bodily harm or death."

¶ 53    Defendant also submitted a Rule 604(h) notice in lieu of a memorandum. Despite asserting that her notice of appeal "describes all applicable grounds for relief in sufficient detail," defendant expounded upon her basis for review of the detainable offense factor. In the notice, defendant contends that the State failed to meet its burden regarding first degree murder as the detainable

offense "because of the State's own proffer that the victim was the initial aggressor and [d]efense counsel's proffer that this was a self defense case." She further argues that defense counsel raised an objection based on the unreliability of the State's proffer, as he did not receive any reports detailing the recovery of the vehicle, narratives about defendant's arrest, or reports about the vehicle's search. Finally, she asserts error in the court's "factoring into its analysis the uncharged offense of aggravated battery with a deadly weapon as an alternative to first-degree murder."

¶ 54      Then, in a footnote, defendant comments that the State's petition did not set forth why it sought pretrial detention, and instead referred to its attached addendum. Defendant acknowledges that the addendum was discussed at the detention hearing—however, the document was never filed with the circuit court and thus is not included in the record on appeal.

¶ 55      Before proceeding, we first address the issue of the missing addendum. The State acknowledges, also in a footnote, that its addendum "was not included with the record." According to the State, the addendum detailed the reasons as to why detention was necessary in relation to the second element of the petition, as well as containing information relevant to the search of the victim's vehicle. The State further notes that defendant, the court, and the court reporter received a copy of the addendum, and the court specifically referenced it when asking questions pertaining to the second element of the petition.

¶ 56      Section 6.1(a) of the Procedure Code requires that the State's petition must state the grounds upon which it contends that pretrial release should be denied, "including the real and present threat to the safety of any person or persons or the community, based on the specific articulable facts" of the case. 725 ILCS 5/110-6.1(c). The State must also tender to defendant all copies of the defendant's available criminal history, any written or recorded statements, any

substance of any oral statements made by any person if so relied upon by the State, and any police reports in its possession. *Id.* § 110-6.1(f)(1).

¶ 57 Our review of the record indicates that a verified form-order petition was filed with the court on February 28, 2024, and, as both parties indicate, the referenced addendum is not included. However, the hearing transcript indicates that the State tendered what appeared to be a 2-page addendum and 33 pages of documents to the court, defense counsel, and the court reporter. These items purportedly contained the case's factual narrative regarding the incident, law enforcement's eventual location of defendant in the victim's vehicle, her statements to police after she was advised of her rights, and her criminal background.

¶ 58 Moreover, defendant does not dispute that she received a copy of the addendum. Neither does she assert that our review is in any way impeded by its absence from the record. This is significant, as it is well-established that it is appellant's burden to present a reviewing court with a full record, and where there is an inadequate record preserving the claimed error, the court of review must presume that the circuit court's ruling conforms with the law. *Foutch v. Bryant*, 99 Ill. 2d 389, 393-94 (1984). Further, there is no indication that defendant attempted to file a supplemental motion to include the missing portions of the petition on appeal. *People v. Mancilla*, 2024 IL App (2d) 230505, ¶ 30. As such, we are inclined to do no more here than to stress to both parties the importance of ensuring a complete record both in the lower court and here on appeal.

¶ 59 That settled, we turn to defendant's claim that the State failed to satisfy its burden of proof regarding the detainable offense element. First degree murder is a forcible felony and eligible for pretrial detention pursuant to section 110-6.1(a)(1.5) of the Procedure Code (725 ILCS 5/110-6.1(a)(1.5) (West 2024)). As correctly noted by the court, at this stage in the proceedings, the court was only concerned with whether the proof was evident or presumption great that a qualifying

offense had occurred, and not the sufficiency of defendant's potential affirmative defense to the charges. See *id.* § 110-6.1(f)(6) (defendant may not move to suppress evidence or a confession, although such information concerning unlawful search or seizure, or both, may be considered in assessing the weight of the evidence).

¶ 60    The State contends that its proffer established clear and convincing evidence of the relevant charge, first degree murder with intent to kill or do great bodily harm to that individual, or with knowledge that defendant's conduct would cause death to the victim. The State observes that the victim was found dead under a blanket in his home following a well-being check by law enforcement, and that a wooden desk leg was also found near his body. The State also notes that defendant was subsequently found in the victim's missing vehicle with a taser, a metal pipe, a wig, and bloodied clothing. The State acknowledges that these items were not considered by the circuit court, but maintains that they may be considered here, citing *People v. Mancilla*, 2024 IL App (2d) 230505, and *People v. Horne*, 2023 IL App (2d) 230382. Further, the State continues, after defendant was advised of her rights, she admitted that she tased and overpowered the victim, struck him several times with a metal pipe until he was lying on the ground, and then bound his hands and feet with neckties and took his phone to prevent him from calling for help while remaining in his home for several hours. Finally, the State asserts, the medical examiner determined that the manner of death was homicide related to blunt force trauma.

¶ 61    The State also indicated in its charging documents that defendant had the intent to kill or do great bodily harm to the victim. During the hearing, much of the discussion on this element concerned defendant's self-defense theory in relation to the physical evidence. Thus, contrary to defendant's contention, it is clear that the court considered the self-defense proffer, as it expressly

noted that it was not "minimizing whatever defenses [could] be asserted in this case" and that defendant's statements to police "weighed heavily" on the court.

¶ 62    In doing so, the court correctly balanced defendant's statements with other portions of the factual proffer, noting that there was no physical evidence that defendant had actually been threatened or attacked by the victim. The court also noted that the Medical Examiner's Office had ruled the cause of death as homicide, specifically caused by blunt force trauma and bleeding on the brain as facilitated by the alleged use of a metal pipe, which was further corroborated by defendant's own statements to police. Finally, in balancing defendant's self-defense theory with whether she had intended to kill or cause great bodily harm to the victim, the court stated that the evidence showed that defendant had hit the victim and bound him so that he was unable to call for help, which, according to the court, was "evident of someone who knows what they're doing and doesn't want to be caught." These findings were reiterated in the court's written order, which characterized defendant's admitted conduct of tasing, overpowering, and striking the victim with a metal pipe as evidence of "reckless disregard."

¶ 63    It is true that defense counsel raised an objection during the hearing regarding the lack of information as to defendant's arrest and law enforcement's subsequent search of the victim's vehicle, which is allowable under the Procedure Code. See *id.* § 110-6.1(f)(6). We note that, according to the hearing transcript, this information was purportedly contained in a paragraph of the State's addendum, which, again, we do not have in the record. Based on the transcript, it appears that most of defense counsel's objection related to the search of the vehicle, which admittedly, apparently resulted in the discovery of defendant's taser, the metal pipe, and bloodied clothing. However, the record reflects that the court expressly noted that it considered defendant's objection in comparison to the overall reliability of the proffer, which included defendant's own

statements to police. *Id.* § 110-6.1(f)(1) (court may consider any written or recorded statements, or the substance of any oral statements made by any person if relied upon by the State in its petition).

¶ 64    The State also rejects defendant's contention that the court improperly relied on an uncharged detainable offense of aggravated battery with a deadly weapon in reaching its conclusion on the first element. The State offers that the court's comment on this issue was prompted by defendant's argument that the victim had been conscious when she left him, with the court's question being hypothetical in nature to make the point that, regardless of intent to kill, the State would still have grounds to detain defendant. We agree with the State's characterization of the court's comments on the matter and find no improper reliance by the court on the uncharged offense.

¶ 65    Accordingly, we do not find error in the court's determination that the first element of the petition was satisfied, and as such affirm the court's finding that the State established, by clear and convincing evidence, the proof was evident or the presumption great that defendant committed the charged crime of first degree murder.

¶ 66                                    2. Real and Present Threat

¶ 67    Next, defendant argues that the State failed to meet its burden of proving that she posed a real and present threat. Defendant maintains that she acted in self-defense and did not initiate the altercation in this incident. Defendant further reiterates that the argument that she is a danger to the community because she has a problem with men in general is entirely unsubstantiated by the proffered evidence. She notes that she has minimal criminal history, with only one misdemeanor conviction on her record.

¶ 68    In response, the State points out that the court specifically considered that the offense involved a weapon; defendant's description of her own hands as "lethal" and that she had used a Taser to overpower the victim; defendant's minimal criminal history indicated that she had a history of assaultive behavior; any psychological or psychiatric history was unrelated to her relationship with the victim, who she referred to as her "sugar daddy"; and that the incident occurred while she was in the presence of the victim's three-year-old daughter. The State also maintains that the court considered and rejected defendant's claim of self-defense, in which it found that the physical evidence did not support the claim that the victim had initiated or struck defendant first, and that there was no evidence to suggest that the victim had previously abused defendant in their short-lived relationship.

¶ 69    After reviewing the record, we find that the State met its burden on this element and that the court's finding was not against the manifest weight of the evidence. Indeed, the record reflects that the circuit court carefully considered all aspects of the proffer based on a variety of statutory requirements and ultimately determined that, even when considering defendant's past criminal history and version of the events, the threat to both identifiable individuals and the general community was too large to allow for pretrial release.

¶ 70    First, the court considered the nature and circumstances of the charged offenses, with one being a crime of violence involving at least one weapon. 725 ILCS 5/110-6.1(g)(1). In its oral ruling, the court referenced both the State's proffer and defendant's purported audio statements to police, where defendant admitted to using a Taser to overpower the victim, and then a metal pipe to beat him. See *id.* § 110-6.1(g)(4) (court can consider statements made by, or attributed to the defendant, based on the surrounding circumstances); *Id.* § 110-6.1(g)(7) (consideration of whether defendant is known to possess or have access to weapons). Additionally, in its oral and written

rulings, the court considered that defendant had bound the victim to prevent him from calling the police, and then stole his car to flee from the scene. Last, although not cited by the court in its oral or written rulings, the record reflects that the pretrial services representative indicated that defendant had scored a "violence flag" based on the nature of the pending charge. See *id.* § 110-6.1(f)(7) (risk assessment tools allowable to assess decisions regarding pretrial release); *Id.* § 110-5(b) (same).

¶ 71   Second, contrary to defendant's contention that there was no evidence that she was a threat to "men generally," the record reflects that the court did not merely consider whether she posed a threat solely to other men, but also to the community at large as well as the victim's minor child "based on the escalation of exhibited violent behavior[] and the beating of [the victim] in their home." See *id.* § 110-6.1(g)(3) (considering the identity of any person to whose safety the defendant could pose a threat).

¶ 72   Third, and again contrary to defendant's claim that her self-defense proffer was not properly considered, the record also reflects that the court gave credence to this narrative, as well as the assertion that defendant had previously been a victim of domestic violence. *Id.* § 110-6.1(g)(2)(B) (consideration of social history, including psychological or psychiatric). However, in weighing these considerations, the court pointed out that there was no physical evidence indicating that she had not been the initial aggressor in the current matter. Further, the court noted that defendant's own statements implicitly suggested that she might have been the aggressor, as she was a self-proclaimed black belt in karate and that her hands "were lethal." See *id.* § 110-6.1(g)(4) (consideration of any statements made by, or attributed to the defendant, in light of the circumstances).

¶ 73    Fourth, with regard to defendant's relationship to the victim, the court noted that the victim had been defendant's self-proclaimed "sugar daddy" with whom she had a brief one-month relationship and who was about 25 to 30 years older than defendant. See *id.* § 110-6.1(g)(4), (g)(5), (g)(6) (considering the ages and physical conditions of the defendant and victim). This implied that the court was concerned with any future assaultive behavior against a subsection of the community, particularly in light of her most recent encounter with an individual she barely knew. See *id.* § 110-6.1(g)(9) (consideration of factors deemed by the court to have a "reasonable bearing upon the defendant's propensity or reputation for violent, abusive, or assaultive behavior[.]").

¶ 74    Fifth, the court considered defendant's history and characteristics with regard to her overall criminal background and self-defense proffer, which, as we have noted above, we do not have documentary evidence of beyond the State's proffer and a pretrial services representative during the hearing. *Id.* § 110-6.1(g)(2) (consideration of history and characteristics, including prior criminal history). The hearing transcript reflects that, after further inquiring of defendant's criminal background, the court learned that defendant had been convicted for battery in 2018 and had served a short jail sentence, albeit not for the same victim. She had also been arrested in 2018 for domestic battery and resisting, all of which was not denied by defense counsel. Although acknowledging that the incidents were "far in time" from the current matter, the court nevertheless considered such events to be evidence of "assaultive" behavior. See *id.* § 110-6.1(g)(2)(A) (evidence concerning prior criminal history indicative of violent or assaultive behavior may also be considered in determining dangerousness). Further, the court noted that defendant's choice to flee from the scene was also problematic, as it was "evident of someone who knows what they're doing and doesn't want to be caught." Moreover, even assuming that we were able to verify

defendant's criminal history where it could be argued that defendant's misdemeanor conviction was "minimal" in light of the circumstances, we would not find error in the court's decision.

¶ 75    As such, based on the record before us, we do not find defendant's contention persuasive that the court did not fully consider all aspects of the proffer under the statutory requirements, which included a variety of factors ranging from the nature of the crime to defendant's individualized history and characteristics. Thus, on this record, we do not find that an opposite conclusion concerning defendant's real and present threat was clearly evident, or that the court's findings were unreasonable based on the evidence presented.

¶ 76                                    3. Conditions

¶ 77    Finally, defendant challenges the circuit court's findings on the third element. She contends that the State did not demonstrate by clear and convincing evidence that no condition or combination of conditions could mitigate any safety risk. She argues that the court erred by failing to consider electronic monitoring as a less restrictive condition of release, and points specifically to the court's comment that electronic monitoring was not an authorized alternative because the victim in this case could not be protected by electronic monitoring as he was already deceased. Instead, defendant posits, electronic monitoring is an available option if there is an "identifiable person or persons" who can be protected, regardless of whether that person is the victim in the case or not. Noting the court's oral ruling that defendant posed a threat to the victim's child, defendant asserts that the child is an identifiable person who could be the basis for ordering electronic monitoring as a condition of release. In her Rule 604(h) notice, defendant additionally argues that there were various mitigating factors that called for less restrictive conditions, such as defendant's history as a domestic abuse survivor and her resulting diagnosis of post-traumatic stress disorder.

¶ 78 The State responds that the court considered less restrictive pretrial conditions but found them to be inadequate. Specifically, the State continues, the court considered electronic monitoring and pretrial services as suggested by defendant, as well as curfew, employment therapy, and continuation of any prescribed medications as potential alternatives. The State also rejects the propriety of electronic monitoring based on the victim's three-year-old child being a protectible "identifiable person." Even assuming that this was correct, the State maintains that the court was not obligated to find that fact dispositive, and under an abuse of discretion standard, we may not reweigh the court's considerations to find otherwise.

¶ 79 After reviewing the record, we again conclude that the circuit court did not err in finding that there were no appropriate conditions to mitigate defendant's risk. Although we initially observe that the State did not expressly argue in its opening proffer as to why detention was solely appropriate, the record reflects that its proffer included the recommendation of pretrial services that defendant be detained under "maximum conditions" based on "supervision level 3." See 725 ILCS 5/110-(5)(b); *Id.* § 110-6.1(f)(7) (circuit court may use non-dispositive risk assessment tools in determining appropriate conditions of release).

¶ 80 Further, the record reflects that the court considered the possibility of electronic monitoring, but ultimately determined that it was not reasonable based on the individualized circumstances of the case. Specifically, the court noted that one of the identifiable victims was already deceased, and that the community at large would be at risk if she was not detained. *Id.* § 110-5(g) (electronic monitoring only appropriate if it would protect an *identifiable* person from imminent threat of serious physical harm). Although defendant contends that there was an identifiable victim, namely the victim's daughter, it is clear that the court considered the nature and circumstances of the offense to be too great to allow for defendant's release, even if the

victim's daughter were considered such a person. *Id.* § 110-5(a)(1) (propriety of conditions assessed by nature and circumstances of offense charged); *Id.* § 110-5(a)(4) (assessing nature and seriousness of the threat to any person posed by defendant's release). Specifically, in its written order, the court found that defendant continued to exhibit "assaultive behavior," pointing to defendant's 2018 battery conviction, the beating of the victim in the presence of the child, and defendant's "disregard for the victim's life by bounding him and taking his phone to prevent him from calling the police."

¶ 81    Accordingly, we also do not find that the court's thorough oral and subsequent written rulings on this element were unreasonable. The record again reflects a careful weighing of multiple factors implicating fairness, safety, and judicial administrative concerns, where ultimately the court concluded that no such conditions could be substituted for pretrial detention in light of the circumstances.

¶ 82    In sum, the record reflects that the State met its burden on all three elements of its petition. We ultimately conclude that the circuit court did not err in granting the State's request for the defendant's detainment prior to trial and affirm the order in its entirety.

¶ 83                            III. CONCLUSION

¶ 84    For the reasons stated, we affirm the judgment of the circuit court.

¶ 85    Affirmed.